# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRENDA PERRIN,** | : | **Civil No. 4:13-CV-2946** |
| **on behalf of J.P.,** | : | |
| | : | **(Judge Brann)** |
| **Plaintiff(s)** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **THE WARRIOR RUN** | : | |
| **SCHOOL DISTRICT,** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

## I.     INTRODUCTION

In this case, the plaintiff, Brenda Perrin ("Plaintiff" or "Parent"), on behalf of her son, J.P., has appealed two separate Due Process Special Education Hearings involving J.P. and the Warrior Run School District ("District").   The District prevailed on both matters at the administrative level.   Neither party has presented new or additional evidence for the court's consideration, and, therefore, the parties have agreed that the court is to review the matter based exclusively on what is contained within the underlying administrative record.   Upon consideration of the parties' briefs and the voluminous record evidence that the parties have furnished to the court, and in accordance with the "modified de novo" standard of review applicable to this

matter, we recommend that the court uphold the Hearing Officer's decisions, affirm the administrative decisions, and enter judgment in favor of the District.

## II.    **PROCEDURAL HISTORY**

In a nutshell, Ms. Perrin contends that J.P. has an intellectual disability based upon having suffered multiple concussions and what she contends is a psychological adjustment disorder.    After noticing what she perceived as changes in J.P.'s performance in school and at home, Ms. Perrin requested that the District conduct an evaluation of J.P. in late 2012 or early 2013.    After the Parent completed the necessary paperwork, the School District conducted a comprehensive evaluation of J.P.  On March 4, 2013, the School District produced a report detailing the results of its educational evaluation, which concluded that although J.P. had some limitations as a result of the concussions he suffered, he did not have an intellectual disability and did not qualify for an individualized educational plan, or IEP.    After reviewing the School District's conclusions, Plaintiff requested that the District pay for a second independent educational evaluation.  The District declined, finding that its evaluation satisfied its obligations under the IDEA and its implementing regulations.  Thereafter, the School District filed for an administrative due process hearing to demonstrate that its evaluation was appropriate, as it was required to do under the IDEA and its

implementing regulations. See 20 U.S.C. § 1415(b)(1) and (d)(2)(A); 34 C.F.R. § 300.502(b)(2)(I).

On July 25, 2013, a due process hearing was held before Hearing Officer James Gerl. On September 10, 2013, the Hearing Officer issued a decision finding that the District's March 4, 2013 evaluation of the Student was appropriate and satisfied all legal requirements. (Doc. 39, Ex. A, Decision of Hearing Officer James Gerl dated September 10, 2013.)

On November 11, 2013, the Plaintiff filed for an administrative due process hearing with Pennsylvania's Officer for Dispute Resolution on November 11, 2013, alleging that the Student was eligible for special education services under either the IDEA or Section 504 of the Rehabilitation Act, and that the Student should receive compensatory education from the District. In this administrative complaint, the Parent alleged that the District failed to meet its "child-find" duties imposed under the law, failed to conduct an appropriate evaluation of the Student, improperly found that the Student was ineligible for special education services and service agreement, and otherwise that the District discriminated against the Student. The District denied all of these allegations.

On January 23 and 24, 2014, Hearing Officer Gerl presided over due process hearings on the Parent's claims. On March 17, 2014, the Hearing Officer issued a

written decision finding in the District's favor, and denying all relief sought by the Parent in the administrative complaint. (Doc. 39, Ex. B, Decision of Hearing Officer James Gerl dated March 17, 2014.)

On December 8, 2013, the Parent filed a complaint with this court seeking to reverse the Hearing Officer's September 10, 2013, adverse decision regarding her request for a publicly funded independent educational evaluation. (Civ. A. No. 4:13-CV-2946.) Thereafter, on June 14, 2014, the Parent filed an appeal with this court seeking to reverse the Hearing Officer's adverse decision finding that the Student was not eligible for special education services pursuant to the IDEA and Section 504, and that the Student was not eligible for compensatory education under the statutes. (Civ. A. No. 4:14-CV-1145.) These appeals have been consolidated in the above-captioned action.

Neither party has conducted any post-hearing discovery, and the parties have agreed that this matter may be adjudicated solely based upon the administrative record.

## III.  <u>STATEMENT OF FACTS</u>

The factual background to this report is taken largely from the two decisions issued by the Hearing Officer, which contain detailed recitations of the relevant facts

which are based upon the parties' stipulated facts, and on the parties' pre-hearing memoranda. (Doc. 39, Exs. A, B ("HOD1" and "HOD2," respectively).)

J.P. is a student within the District. In the fall of 2013, J.P. was a student in the 10th grade in the Warrior Run School District. On or about September 13, 2012, J.P. suffered an injury when he jumped over a gym chair as he was leaving gym class, and was diagnosed with a concussion after hitting his head on a door frame. J.P. was permitted to return to school on September 18, 2012. Although he was cleared to return to school, under the "restrictions" area on the form the word "none" was crossed out and the words "not cleared" were written in its place. (HOD1, ¶ 13.) On September 19, 2012, a doctor advised the School District that J.P. was being treated for an acute concussion and was not to participate in any contact sports. It was further indicated that J.P. might need certain accommodations to allow him extra time to complete homework and tests administered during this time in the short term. (Id. ¶ 14.) Thereafter, on September 27, 2012, a doctor issued a note stating that J.P. was permitted to return to school with no academic or physical restrictions. (Id. ¶ 15.)

On December 14, Parent reported that J.P. had suffered a second concussion on December 13, 2012, also during a gym class. J.P. reportedly sustained the concussion after hitting his head on a volleyball pole. He was permitted to return to school, but was not permitted to perform any "mental activity." (HOD1, ¶ 3.) On

December 13, 2012, a doctor produced a certificate for J.P. excusing him from gym until further notice. (HOD1, ¶ 16.) On December 17, 2012, a doctor issued another form stating that J.P. would need a "504/IEP" evaluation, and that J.P. should have no mental activities at school, including testing. (Id. ¶ 17.)

On December 20, 2012, Parent requested that J.P. be given an educational evaluation. Thereafter, the School District issued a Permission to Evaluate, and Parent signed the form on January 7, 2013, indicating therein that her concerns related to "concussion issues" and directing officials to see something identified as a "neuro report." (Id. ¶ 5.) On January 3, 7, and 9, 2013, a clinical neuropsychologist evaluated J.P.. As part of this evaluation, J.P. and his mother reported to the neuropsychologist that he had suffered three prior concussions: one in 2009 as a result of a soccer injury; one in September 2012 as a result of the head injury following gym class; and one in December 13, 2012, from striking his head on a volleyball pole. In the family history section of the report, J.P.'s mother indicated substantial issues for concern, noting a history of aggression, learning disability, depression, anxiety or adjustment problems, alcohol abuse, substance abuse, antisocial behavior, arrest/incarceration, physical abuse (victim), and physical abuse (perpetrator). (HOD1 ¶ 21.)

The evaluator administered several tests, including the Wechsler Intelligence Scale. As part of this evaluation, the evaluator found a full scale IQ of 91, which is in the average range, and concluded that J.P.'s profile was consistent with normal neuro-cognitive development with no evidence of attention deficit disorder, learning disability, developmental language delay or other cognitive processing disorder. Furthermore, the test results did not indicate any characteristics of classic post-concussion syndrome, which almost always reveals deficits in both lower level executive functioning and learning new information. As a result of the testing done, the evaluator found that J.P. had an adjustment reaction with mixed emotional features, and resolving post-concussional syndrome. Because the evaluator found no evidence of deficits across measures of verbal, perceptual motor, lower level executive, higher level reasoning and learning/memory, the evaluator made no specific ability recommendations. Likewise, the report made no specific academic skill recommendations since the neuropsychological test findings revealed no evidence of risk factors for a learning disability in reading, spelling or math. However, in light of the problems that were revealed in J.P.'s home, the evaluator recommended the use of a cognitive-behavioral approach, and child-family counseling was recommended. (Id. ¶ 21.)

On January 23, 2013, the School District's special education director wrote to the Parent requesting a copy of the report of J.P.'s neuropsychological evaluation. On January 31, 2013, a doctor issued a note to indicate that J.P. was under his care for neurology, and indicated the doctor's opinion that he thought J.P. "will need to be evaluated for IEP or 504 plan." (Id. ¶ 23.) Likewise, on February 1, 2013, a doctor provided a note stating that J.P. continued to receive neurological care, and that he would need to have an IEP or 504 evaluation, and that J.P. had medical clearance to be evaluated in a school setting. (Id. ¶ 24.) The School District received J.P.'s neuropsychological report on February 1, 2013. (Id. ¶ 25.)

On March 14, 2013, a doctor again issued a note to indicate that J.P. continued to receive neurological care, and that J.P. was to engage in no contact sports. Although he was cleared for school work, it was noted that he may require accommodation as tolerated according to an IEP or 504 plan. (Id. ¶ 26.)

The School District's special education director is charged with overseeing the collection of data and developing draft evaluation reports once a request for evaluation is received. The special education director begins this process by opening a secure network drive with a template created based on a form provided by the State Department of Education. The special education director provided the members of J.P.'s multi-disciplinary team with a sentence starter written in the third person in the

required section to allow team members to locate and fill in required responses to requested information. The members of the team thus recorded their own observations on the template with two exceptions: one teacher had computer trouble, and used the special education director's computer to input the data; additionally, a gym teacher was not comfortable using computers, so he dictated his answers and information to the special education director, who typed it into the system as he stood over her shoulder. The teachers and staff reviewed the final evaluation report, and none raised any objection to the report's statement of their input regarding J.P. The information provided by teachers and staff on J.P.'s team was found to be accurately reported in the report. (Id. ¶ 27.)

The school district's psychologist was J.P.'s primary evaluator. (Id. ¶ 28.) She has a master's degree in school psychology and at the time of her evaluation had over 24 years of experience as a school psychologist. The school psychologist was trained and knowledgeable about the assessments used, and was well qualified to administer the assessments she gave to J.P. (Id.)

As noted, the School District prepared a comprehensive evaluation on March 4, 2013. The report begins with a detailed history of J.P.'s concussions and the doctors' notes that followed indicating a prohibition on academic activity. The evaluation analyzes in detail the neuropsychological assessment of the student

conducted on January 3 and 7, which constitutes 2 and one-half pages of the 48-page report. The evaluation next proceeds with observations and input provided by J.P.'s teachers, his counselor, the school nurse, and the school psychologist. As noted, with two exceptions, their input was provided directly into evaluation forms by the teachers and staff, and in all cases the teachers and staff reviewed and approved their responses before the report was finalized. Accordingly, the Hearing Officer found that their input had been accurately recorded. (Id. ¶ 29.) The report includes a detailed analysis of J.P.'s grades and test scores, and indicates that two formal assessments were conducted by the school psychologist as part of the evaluation: The Woodcock-Johnson Cognitive and Achievement Tests, Third Edition, and the Behavior Assessment System for Children, Second Edition (BASC-2).

J.P.' achievement levels on the Woodcock-Johnson tests were in the average range – consistent with the testing that had been done by the neuropsychologist previously. The BASC testing, which also accounts for social and emotional issues, as well as adaptive behavior, was also in the average range with one exception. That exception came from one of J.P.'s teachers who gave some answers that apparently diverged from those supplied by others. Accordingly, the school psychologist inquired of this teacher, who informed her that J.P. was not paying attention in class

because he had been relieved from any requirement to do any academic work because of medical restrictions following the concussions he sustained.

The Hearing Officer found that the formal assessment measures that were employed by the school district were reliable and valid and applied consistently with their respective directions. As part of this process, comments and input from J.P.'s mother as part of a background questionnaire were also discussed and considered, and the school psychologist interviewed J.P. as well. During that interview, J.P. told the psychologist that the prior 12 months had been "the worst period in his life." (Id. ¶ 29.) J.P. stated that he had been dealing with issues relating to his father's use of alcohol, and similar issues relating to his mother's boyfriend. J.P. indicated that he had aggravated an injury to his hand trying to break up a fight between his sister and his mother, suggesting some difficulty at home. (Id.)

The evaluation also included two formal classroom observations by the school psychologist, and two classroom observations by the school counselor. The evaluation included a conclusion that J.P. had a disability as a result of his two concussions; however, the report also concluded that J.P. was not in need of specially-designed instruction and that his disability did not substantially limit the basic life function of learning. The Hearing Officer found that this conclusion was correct. (Id.)

One of the issues that the Parent apparently raised earlier was a suggestion that some of the teacher input had been erroneous or fabricated, because in some isolated instances the school psychologist had entered information provided by teachers. Thus, during the evaluation process, the psychologist inquired of J.P.'s world cultures teacher to resolve an ambiguity in a response. At that time, the world cultures teacher needed to leave for another commitment, so he and the school psychologist agreed that she would write down what he said to her to clarify his earlier response, and then review what she had typed to confirm its accuracy. The school psychologist and the teacher completed this process, after which the teacher attested to his agreement with the revised statement. Thereafter, the school psychologist destroyed the earlier answers, because they had been supplanted by the teacher's revised explanation. The Hearing Officer found that the school psychologist did not alter the teacher's answers or otherwise change the meaning of his input. (Id. ¶ 30.)

According to testimony by the school counselor and school psychologist, which the Hearing Officer credited, J.P.'s academic performance did not vary before or after his two concussions, since he consistently put forward effort in classes that he enjoyed, but did not in those he did not like.

On June 7, 2013, the Parent hand delivered to the School District a letter dated May 28, 2013, requesting an independent educational evaluation. As a reason

therefore, the Parent stated that the evaluation the School District had undertaken found that J.P. did not have a disability and was not eligible for a Section 504 plan. She also charged that the School District failed to provide access for J.P. to use the Brain STEPS program. (Id. ¶ 34.) In response, the School District filed a Due Process Complaint with the Office of Dispute Resolution on June 13, 2013. On September 10, 2013, the Hearing Officer found that the School District's evaluation was appropriate and complied with all legal requirements, and, therefore, that the Parent was not entitled to an independent educational evaluation at public expense.

In reaching this conclusion, the Hearing Officer found that the School District's evaluation of J.P. was comprehensive, relied on multiple analyses and measures, and was based upon testing and tools administered by trained and knowledgeable personnel. He found that the evaluation was comprehensive in scope and individually focused on J.P., through a process that included review of existing data both before and after J.P.'s concussions, as well as the evaluation of the neuropsychologist that had been conducted earlier. The Hearing Officer noted that the evaluation considered the observations of teachers, as well as formal classroom observations of J.P. on four separate occasions.

On December 8, 2013, the Parent filed suit in this Court, challenging the Hearing Officer's decision. (Civ. A. No. 4:13-CV-2946.)

Meanwhile, on September 3, 2013, a doctor faxed a note to the School District to advise that J.P. was under his neurological care, and expressing his opinion that J.P. required an IEP to help him in school due to his underlying medical condition. In the alternative, the doctor opined that "[i]n the absence of IEP, the student will need to be cyber schooled while attending regular school few hours every day. IEP should be in place shortly so that student can return to school." (HOD2, p. 14, ¶ 32.) Upon receipt of this note, the School District's new special education director checked with the counselor to determine how J.P. was doing. This inquiry revealed that J.P. was continuing to do well and was progressing without accommodation in a part in-school, part cyber-school program. Because J.P. was reportedly making progress under his program, and because the doctor's note contained no evaluation, the special education director took no further action. (Id., pp. 14-15, ¶ 33.)

In September 2013, the counselor met with J.P. and the Parent to revise J.P.'s schedule to allow him to enroll in three cyber school classes, while J.P. would continue to attend several classes at the school. J.P. registered for cyber classes in American History 1, Cyber History Science, and Cyber English 2. At the same time, J.P. attended Art Studio 2, Algebra 2, Basic Woodworking, and Career Readiness 2 at the school. (HOD2, p. 15, ¶ 34.) J.P. told the Brain STEPS team that he was falling behind in his cyber classes because he was failing to log in every day, and

often went seven to eight days at a time without logging into his cyber courses at all. (Id., p. 15, ¶ 35.)

However, when J.P. managed to log into his classes, he showed himself capable of completing his assignments. Thus, when J.P.'s mother discovered that the deadline in J.P.'s American History class was fast approaching and that J.P. had 10 uncompleted assignments, he logged in on January 9, 2014, and spent approximately 250 minutes logged in while finishing all 10 outstanding assignments. This flurry of catch-up activity prompted his mother to tell the Director of Curriculum that "he can do the work. He's just lazy." (HOD2, p. 15, ¶ 36.)

In January 2013, J.P.'s school counselor contacted the School District's Brain STEPS program, which is a voluntary program coordinated by the Intermediate Unit to help students who have suffered brain injuries return to school. The purpose of this call was to explore possible services available for J.P. At the time of the Hearing Officer's second due process decision, the Brain STEPS program had served 38 students with brain injuries, seven of whom had IEPs. At that time, 13 cases remained pending, and of those students, three had Section 504 plans. (HOD2, pp. 16-17, ¶ 40.)

After J.P.'s doctor cleared his return to school on March 28, 2013, J.P.'s Brain STEPS team met to develop a back-to-school plan for J.P. The team members

included a staff member from the Intermediate Unit, a speech therapist, a neuropsychologist, a teacher, a special education supervisor, the new special education director, the school nurse, the school counselor, the new school psychologist, J.P., the Parent, J.P's lawyer, and the School District's attorney. (Id.) The plan being developed required J.P.'s teachers to provide the counselor with a list of essential quizzes, papers, projects and assignments, and J.P. was to meet with the counselor every morning to be provided with a list of the work to be accomplished that day; on days when J.P. was absent, the plan called for his mother to contact the counselor. (Id.) The plan also included a review of J.P.'s status in each of his classes. Teachers were to reduce tests to critical information, as necessary, until the team met again to determine if changes were warranted. The team also recommended that J.P. have scheduled rest periods in the nurse's office for 10 to 15 minutes at the beginning of Periods 2 and 7, that the student should use his after-school time to do current assignments and use in-school time to make up past work. It was recommended that J.P. be provided with a World Cultures 2 book to use at home, if available, and that J.P. be registered with a website provider that made audio text available at home. The team met again on April 22, 2013, at which time additional recommendations were added to J.P.'s Brain STEPS plan. (Id., pp. 17-18, ¶¶ 40-41.)

The following month, on May 10, 2013, the Intermediate Unit Brain STEPS coordinator observed J.P. in his science class, during which she witnessed J.P. ask questions, participate appropriately, and noted that he had his materials with him and available. The coordinator did see that J.P. was missing his agenda, which was used for writing down assignments. When she asked J.P. about it, he told her that he did not have any problem remembering assignments and writing them in the agenda at the end of the day. (Id., p. 18, ¶ 43.)

The Brain STEPS team met again on May 23, 2013. During that meeting, the Intermediate Unit's consultant shared her observations from J.P.'s science class, and J.P.'s multiscience teacher told the team that J.P. was catching up quickly on his classwork. The team concluded that J.P. was doing well, and they made some additional recommendations to help him further with the program. (Id., pp. 18-19, ¶ 43.)

At the beginning of the following academic year, school counselor completed a report showing that J.P. was demonstrating task completion, homework completion, and classroom performance comparable to his peers. On September 13, 2013, J.P. told the school nurse that he was no longer experiencing any concussion-related symptoms, and thus he saw no purpose in filling out the concussion questionnaire

because he would answer every question in the negative. The nurse reported this statement to the Brain STEPS team at the following meeting. (Id., p. 19, ¶ 45.)

The Brain STEPS team met again in November 2013, which was apparently called by the school counselor, after J.P.'s mother told her that she had updated medical information from J.P.'s neurologist. However, at the meeting, the Parent produced no new medical information. Instead, the Intermediate Unit's Brain STEP's consultant noted that J.P. had not been reporting any new symptoms, and with that lack of feedback, and the absence of new information from the student's doctor, there was no ongoing need for the team to continue to meet about J.P. Additionally, J.P.'s mother refused to give permission for the Brain STEPS team to speak with J.P.'s doctor. Because of her refusal to allow the Brain STEPS team access to J.P.'s physician, and because the Brain STEPS team had not been provided any substantive information that would have supported continuing J.P. in the program, the Brain STEPS team has not met since November 11, 2013. (HOD2, p. 20, ¶ 46.)

Also during this time, the School District's athletic trainer had administered impact testing, which is a battery of tests given to athletes like J.P. who participate in contact sports. The testing involves obtaining baseline data, which is then compared against a screening battery taken after a student suffers a concussion to help determine if and when the student is ready to return to sports. J.P. had a baseline

taken in December 2011, before he began wrestling. He had a follow-up impact test after his second concussion, which was conducted on December 14, 2012. He had a follow-up test on August 9, 2013, at Parent's request. According to the evidence provided to the Hearing Officer, J.P.'s cognitive efficiency index on the impact test went from .16 on December 14, 2012, to .34 on August 9, 2013, which indicated that his post-concussion symptoms were decreasing. The value of the impact testing data was relatively minimal in J.P.'s case, however, because the information was specific to athletics and, for that reason, was not shared with the school nurse, teachers, or psychologist, the latter of whom did not know how to interpret the information that the test provided. (Id., p. 21, ¶ 47.)

During the 2012-2013 school year, J.P.'s principal did not approve his attendance at a criminal justice program and a local career and technology consortium because he had accumulated too many absences from school. The process for determining whether students had excessive absences that would not allow their attendance at outside consortiums is undertaken without consideration of the student's identity. Thus, the principal looks at data concerning student absences and disciplinary action without accessing the students' names, which she covers up. The principal also does not differentiate between excused and unexcused absences because the grading program at the career and technology consortium uses absences

as one of its criteria for assigning grades. J.P. had been put on the waiting list for the program during the 2011-2012 school year, but was not accepted into the program. For the same reasons, J.P. was not enrolled in the program during the 2012-2013 school year; he was again placed on the waiting list. (HOD2, pp. 21-22, ¶ 48.)

In consideration of the evidence presented regarding J.P.'s concussions, his subsequent academic performance, his educational evaluation, the information developed by J.P.'s Brain STEPS team, and the other record evidence that did not support a finding that J.P.'s concussions adversely affected his educational performance, the Hearing Officer concluded that J.P. does not need special education and related services, and that J.P.'s concussions do not substantially limit a major life activity such as learning. (HOD2, p. 22, ¶¶ 51-52.)

IV.   **STANDARD OF REVIEW**

The procedure for reviewing a hearing officer's decision in an IDEA case is distinct from the typical standard of review the applies in summary judgment proceedings. In an IDEA case, courts apply a "modified de novo review." L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 (3d Cir. 2006).

Under this standard, in accordance with Section 1415(i)(2)(C) of the IDEA, when presented with an appeal of a hearing officer's decision, the court receives the record of the administrative proceedings, and following review of that record and the

hearing officer's decision, shall base its decision on the preponderance of the evidence, and grant relief that the court determines is appropriate. See 20 U.S.C. §§ 1415(i)(2)(C)(i)-(iii). In rendering its decision, the court exercises plenary review over the legal conclusions of a hearing officer but must give "due weight" to his factual findings. Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982); Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004); Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 528 n.3 (3d Cir. 1995). This deferential standard of review is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206. Although the court has the discretion to determine how much deference is due a particular decision based on the record, Scott P. v. Carlisle Area School Dist., 62 F.3d 520, 527 (3d Cir. 1993), the factual findings made during the administrative proceedings are to be considered "prima facie correct," and if the court departs from those findings, it is required to explain its basis for doing so. S.H. v. State-Operated School District of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003). Additionally, where the hearing officer has considered competing testimony and evidence, the hearing officer's decision is entitled to "special weight," and in order to overturn or depart from that determination, the Court must have the same level of "justification" that a federal appellate court would need in order to overturn the

factual findings of a federal district court. <u>Shore Reg'l High School Bd. of Educ.</u>, 381 F.3d at 199. The Third Circuit requires that if the court does not follow the agency's ruling, it must explain why its decision differs. <u>Scott P.</u>, 62 F.3d at 527 (citation omitted).

Because of the expertise of the administrative agency in special education cases, the court must "consider the [administrative] findings carefully and endeavor to respond to the [agency's] resolution of each material issue." <u>Susan N. v. Wilson Sch. Dist.</u>, 70 F.3d 751, 758 (3d Cir. 1995) (quoting <u>Town of Burlington v. Dept. of Educ.</u>, 736 F.2d 773, 791-92 (1st Cir. 1984), aff'd on other grounds, 471 U.S. 359 (1985)).

The party seeking relief at a due process hearing bears the burden of proof before the agency. <u>Schaffer v. Weast</u>, 546 U.S. 49, 58 (2005); <u>L.E. v. Ramsey Bd.of Educ.</u>, 435 F.3d 384, 391-92 (3d Cir. 2006). Accordingly, as the party that initiated the administrative hearing, and the party challenging the unfavorable decision of the hearing officer, Perrin bears the burden of proof as to each of her claims. <u>Ridley Sch. Dist. v. M.R.</u>, 680 F.3d 260, 270 (3d Cir. 2012).

## V. <u>DISCUSSION</u>

In this action, the Parent has challenged the Hearing Officer's September 10, 2013, decision in which he found that the School District appropriately evaluated J.P.

In addition, the Parent has appealed the Hearing Officer's March 17, 2014 decision in which he found that the School District did not violate it's child-find obligations under the IDEA, did not discriminate against J.P., and did not otherwise violate the IDEA or Section 504 by declining to provide J.P. with an IEP, which the Hearing Officer found J.P. did not require as a result of his concussions. Below we first consider the issues presented during the first Due Process Hearing, before turning to the Parent's challenges to the second decision of the Hearing Officer.

### A. The Hearing Officer Correctly Found that the District's Evaluation of J.P. was Appropriate and Legally Sufficient

Under the IDEA, a student evaluation must be conducted within 60 days of receiving parental consent. 20 U.S.C. § 1414(a); 34 C.F.R. § 300.301(c)(1)(i). The IDEA obligates a local educational agency to conduct a "full and individual initial evaluation . . . ." 20 U.S.C. § 1414(a)(1)(A). The child must be "assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). The evaluation must be sufficiently comprehensive in order to identify all of the child's special education and related service needs. 34 C.F.R. § 300.304(c)(7); see also 34 C.F.R. § 300.303 and 22 Pa. Code § 14.153(3). The law calls for an evaluative process that relies on a "variety of tools and strategies," including information provided by the parent, in order to provide decisionmakers with relevant functional information. 20 U.S.C. §

1414; 34 C.F.R. § 300.304(b)(1). Student evaluations are to be administered in a manner that is most likely to yield relevant and accurate information about what the child knows and can do academically, developmentally and functionally. 34 C.F.R. § 300.304(b)(1)(I). The evaluators must use technically sound testing instruments. 20 U.S.C. § 1414(c)(1)(A)(ii), (iii); 34 C.F.R. § 300.305(a)(1). The educational testing agency must also use information provided by the student's parent or parents that may be helpful, including evaluations or other information. 20 U.S.C. § 1414(c)(1)(A)(i); 34 C.F.R. § 300.305(a)(1)(i).

The key to an educational evaluation is the methodology employed. See L.S. v. Abington Sch. Dist., Civ. A. No. 06-5172, 2007 WL 2851268, *12 (E.D. Pa. Sept. 28, 2007) ("The parents here simply cannot argue that the evaluation is inappropriate because they disagree with its findings. The key is in the methodology. The conclusions, or lack thereof, cannot be inadequate unless the methodology is inadequate, because that is the only provision in the law."). Moreover, IDEA evaluations depend upon th exercise of professional judgment, which is entitled to a reasonable degree of deference. County Sch. Bd. of Henrico County v. Z.P., 399 F.3d 298, 307 (4th Cir. 2005) ("We recognize, of course, that at all levels of an IDEA proceeding, the opinions of the professional educators are entitled to respect."). For that reason, a plaintiff challenging the conclusions reached by professionals

administering an educational evaluation must prove that the exercise of professional judgment was actually wrong, and not simply a matter of doubt. See L.S., 2007 WL 2851268, *12; see also Alex R. v. Forrestville Val. Comm. Unit Sch. Dist., 375 F.3d 603, 614 (7th Cir. 2004). Thus, plaintiffs challenging adverse child-evaluations must show that the evaluation itself was flawed through an inappropriate process, meaning one that failed to comply with regulatory requirements, and, therefore, failed to find clear disabilities or failed to investigate sufficiently suspected areas of disabilities, without justification. Bd. of Educ. of Fayette County v. L.M., 478 F.3d 307, 313 (6th Cir. 2007).

In this case, the Plaintiff has failed to demonstrate that the methodology employed by the District was flawed, and instead merely highlights instances of disagreement with the District's evaluations and ultimate determination. Thus, the Parent has not persuasively argued or explained how the evaluation that was conducted was inadequate or why the conclusions reached from that evaluation should be set aside. Indeed, following our review of the record and the transcript during which multiple witnesses, including the evaluator testified, we find that the record supports the Hearing Officer's conclusion that the District's evaluation was appropriate.

We turn to the Hearing Officer's first decision in which he found that the School District's evaluation of J.P. was legally adequate, and that the Parent was not entitled to an additional independent educational evaluation at public expense. First, the educational evaluation was completed within the timeline prescribed by the law, and was conducted by a school psychologist with nearly two and a half decades of experience in the field, using a variety of valid and reliable assessment tools aimed at assessing J.P. in all areas of suspected disability.

As noted above, the evaluation and the report that the School District produced included input from J.P.'s teachers, his guidance counselor and the school nurse. The Hearing Officer summarized the process employed by the School District to require all members of J.P.'s multidisciplinary team ("MDT") to input their feedback directly into the evaluation report before the document was returned to the school psychologist for her input. This process was followed with two exceptions, one involving a teacher who had computer trouble and another who did not like to type, and in these cases the teachers worked directly with the school psychologist to input the information, which was entirely their own contribution. These teachers, like all members of the MDT, were required to review and sign the final report, which the record shows occurred here. (Doc. 6, Administrative Record ("N.T.1") at 58, 59, 116, 117.) J.P.'s mother has suggested that the process was not followed faithfully, and

hence that the evaluation report is itself flawed or unreliable, lacks support, is speculative, and would require a conclusion that the school psychologist fabricated or materially altered the report, and that the two teachers who did not manually enter their own feedback attested to the accuracy of a document that had been changed. There is simply no basis upon which the Hearing Officer could have, much less should have, made this unsubstantiated conclusion.

When the school psychologist received the draft evaluation report that contained information furnished by the nurse, guidance counselor and teachers, she reviewed it together with an independent neuropsychological evaluation that had been completed by Dr. Richard E. Dowell, along with some of J.P.'s medical documents, the Parent's consent form, and the Parent's background questionnaire.[1] The Parent had sought J.P.'s evaluation as a result of his having suffered two concussions, as well as information that was identified only as "see neuro report." In addition, she expressed concern about J.P.'s grades, his attention, and other symptoms believed to be related to his concussions. (N.T. p. 129, ll. 16-24.) Dr. Dowell diagnosed J.P. with Resolving Post-Concussional Syndrome with self and parental reports and

---

[1] It appears to be undisputed that the Parent has never fully complied with the School District's request to speak directly with J.P.'s medical and mental health doctors, or that she did not furnish the District with all of J.P.'s medical records.

Adjustment Reaction with Mixed Emotional Features. (N.T. p. 131, ll. 10-24.) Notably, Dr. Dowell only recommended that J.P. undergo cognitive behavior therapy. (N.T. p. 132, ll. 2-12.)

Even with this information, and Dr. Dowell's substantial testing, the school psychologist administered additional formal and informal tests to examine J.P.'s cognitive and academic ability, as well as his social, emotional and behavioral needs. (N.T. p. 134-35, 231.) As noted, the school psychologist chose the Woodcock-Johnson Cognitive and Achievement Tests, and did so for a specific and tailored reason: the test measures a student's processing abilities, which is an area that sometimes experiences complications following a concussion. This was also a test with which she had considerable experience, having trained personally with Richard Woodcock for whom the test is named, and his co-authors. (N.T. p. 161, ll. 15-25.)

The school psychologist's test results were consistent with Dr. Dowell's findings, but she nevertheless undertook further analysis. Thus, the school psychologist examined J.P.'s grades on classwork and homework, and his performance on completing his classwork and homework, during 10th grade before, between, and after each concussion. (N.T. p. 231, ll. 13-22.) She also looked backward at J.P.'s performance in 9th grade, and she conducted follow-up interviews with his teachers. (Id.)

The psychologist undertook an assessment of J.P.'s performance in terms of assignments and grades before, after, and between the September 2012 and December 2012 concussions, and compared these results against J.P.'s 9th grade performance, and included information supplied by J.P.'s teachers so that she could develop a richer picture of J.P.'s overall performance in school. Additionally, she sought input from the school principal and the guidance counselor to ensure that she was interpreting the high school's grading system appropriately. (N.T. p. 231, ll. 13-22; Ex. S-7, p. 189-91.) The school psychologist also reviewed the information supplied by J.P.'s teachers in the evaluation report, and she interviewed the teachers. (N.T. p. 137, ll.23 - p. 137, l. 24; N.T. p. 231, ll. 13-22.)

Based upon the foregoing information, the MDT concluded that there had not been a significant change in J.P.'s academic performance from before or after his two concussions, or even between his 9th and 10th grade school years. The team found that in those classes that J.P. liked, he performed well; in the classes he did not like, he did poorly. (N.T. p. 158, ll. 4-9; N.T. p. 231, ll. 13-22.)

The school psychologist also looked at J.P.'s emotional and behavioral levels, because his mother had expressed concerns and Dr. Dowell had diagnosed J.P. with Adjustment Reaction with Mixed Emotional Features. Accordingly, she administered the BASC-2. (N.T. p. 163, ll. 14-23.) In completing this process, and to get a large

sampling of feedback, the psychologist sought participation from J.P., his mother, and four of J.P.'s teachers. (N.T. p. 163, ll. 1-21.)

During this process, one of J.P.'s teachers provided scores to questions in one suspected area of disability – namely, attention – and the psychologist met with the teacher to understand better the teacher's answers. As part of this interactive process, the teacher told the psychologist that J.P. "doesn't have to pay attention anymore because he doesn't have to do anything, so he is not paying attention." (N.T. p. 164, ll, 1-21.) This was evidently the only score that raised significant concern with respect to attention, and did not supply a pattern to the scores, which is the way in which the test administrator can perceive an agreement about an area of concern. In other words, the BASC results did not yield scores that gave rise to concern.

Nevertheless, the psychologist further investigated J.P.'s functional performance by conducting informal assessments, including classroom observations, an interview with J.P., and a questionnaire that was provided to teachers for their impressions and observations about J.P.'s behavior and performance from the beginning of the school year through the evaluation. (Def. Exs. S-2, S-3 at 34; N.T. pp. 149-50.) Additionally, the psychologist sought additional data to see whether J.P. was experiencing symptoms typically associated with concussion – since J.P. had only reported three complaints of headaches, and no other symptoms. (N.T. p. 150.)

The psychologist also took care in deciding which of J.P.'s classes to observe. Thus, she selected four courses, two that he was passing and two in which he was struggling. (N.T. p. 142 - p. 147; Ex. S-3; Ex. S-7 at 198-200.) The psychologist concluded after observing J.P. that his failure to pay attention was volitional and the product of his own choice. (N.T. p. 147, ll. 9-18.)

Finally, in her interview with J.P., the psychologist was informed that the prior year had been the worst of J.P.'s life, the result of problems at home. According to the psychologist, this was consistent with Dr. Dowell's measured recommendation for cognitive behavior therapy, along with child and family counseling. (N.T. p. 132.)

As the foregoing makes clear, the School District's evaluation of J.P. was thorough and satisfied the legal requirements identified above. J.P. was assessed in all areas of his suggested disability, by an experienced psychologist who used scientifically reliable assessment tools in a variety of contexts. The assessments were analyzed and summarized by an evaluator with more than two decades of experience, which allowed her to compare J.P.'s educational performance over time, and to reach the supported conclusion that J.P. was not eligible for special education services or a service agreement. Although the Parent was disappointed with the result of this extensive and detailed evaluation, she has come forward with no compelling legal argument or factual showing to demonstrate that the School District's evaluation was

legally deficient or that the Hearing Officer's decision was anything other than reasoned and based upon substantial record evidence.

Instead, the plaintiff has asserted that the evaluation was flawed because: (1) the teacher's reports provided at parent-teacher conferences held in November 2012 differed from the input that they later provided in the evaluation; (2) teacher input was provided in the third person; (3) some teacher input was revised by the school psychologist; (4) the impact test conducted by the athletic trainer was not taken into consideration; (5) the School District failed to refer J.P. to Brain STEPS; and (6) the school psychologist dismissed medical information provided by J.P.'s treating clinicians. These arguments are, in the end, meritless and lack support.

The plaintiff's claim that the evaluation differed from information gleaned during parent-teacher conferences conducted months earlier does not provide any basis for concluding that the evaluation itself – which was detailed, multi-faceted, and subject to considerable analysis by a trained psychologist – was somehow lacking. Moreover, we agree with the School District's point that it is hardly illogical that J.P.'s academic progress and classroom performance would differ from a time when he was actually responsible for completing classwork and homework to the time when he was no longer permitted to do any school work at all.

With respect to the contention that the evaluation was flawed because teacher input was written in the third person is likewise unpersuasive. The record contains evidence that was presented to the Hearing Officer attesting to the manner and process by which the School District conducted evaluations. The school psychologist attested that in order to save time during the editing process, she inputs the MDT names and a third-person sentence starter. The teachers are then responsible for entering their own responses, save in two cases where teachers had technical issues and Dr. Fry helped to enter their information without contributing to or in any way altering the substance of their responses. The plaintiff has provided no legal basis for compelling the Hearing Officer or this court to conclude that the grammatical structure of the teacher input somehow compels a finding that the evaluation was flawed.

The Parent's suggestion that the school psychologist altered the report is without any support aside from her own speculation, and the evidence in fact shows that all members of the MDT reviewed, attested to, and signed the final version of the evaluation report. There is no basis at all to conclude that the information contained within the evaluation is anything other than that furnished by the teachers themselves.

The Parent has also asserted that the evaluation was fatally flawed by the failure to include the results of the athletic impact tests that J.P. was administered.

However, there is no legal support for this argument, and as a factual matter it is questionable what value, if any, this testing would have had upon the overall evaluation of J.P.'s educational ability. The School District's evaluation was detailed and relied on a variety of tests and scientifically valid tools that were administered shortly after the Parent requested that J.P. be evaluated. The failure to include the impact testing does not detract from the rigorous and broad assessment that the School District undertook and, if anything, the use of the impact testing would have been questionable since the school psychologist did not know how to interpret the information that the test generated which, in any event, appears to show that J.P. was making improvements in his functioning. Furthermore, J.P. was subjected to a comprehensive neuropsychological evaluation subsequent to the impact testing, which the Parent agreed was comprehensive and reliable. (N.T. p. 274, ll. 2-24.)

The Parent has not explained what relevance the School District's decision whether or not to refer J.P. to Brain STEPS has in this case. The record shows that the School District did, in fact, attempt to obtain support from this program for J.P. but that the Parent refused to assist in this process by withholding her consent that would have allowed the team to review J.P.'s medical records.

The Parent, disappointed with the outcome of the evaluation, also suggests that the School District dismissed or disregarded information that she provided regarding

J.P.'s medical diagnosis. Upon consideration, we disagree that this is what the record shows. The evaluation report produced on March 4, 2013, clearly shows that the School District recognized that J.P. had suffered from concussions and that the concussions may have caused a short-term disability. (N.T. p. 173, ll. 16-24.) Thus, this information was disregarded. What the Parent seems to be suggesting is that J.P.'s concussions, and any disability that resulted from them, compelled a finding that J.P. was eligible for special education services. To the extent this is the suggestion, the Parent is wrong because the law makes clear that a student's injury or other disability only entitles him to such services if it limits a major life function or adversely affects the child's ability to learn and access education. See 20 U.S.C. §§ 1401(3)(A) and (ii) Moreover, the fact that J.P.'s doctors wrote notes purporting to prescribe special education services or an IEP, the School District was not obliged to offer such services because a doctor cannot simply prescribe them. As the Court of Appeals for the Seventh Circuit explained:

> [A] physician's diagnosis and input on a child's medical condition is important and bears upon the team's informed decision on a student's needs. See 20 U.S.C. § 1414(c)(1)(A)(iii). But a physician cannot simply prescribe special education; rather, the Act dictates a full review by an IEP team composed of parents, regular education teachers, special education teachers, and a representative of the local educational agency. Id. § 1414(d)(3)(C) (detailing what the IEP must consider); id. § 1414(d)(1)(B)(i)-(vii) (detailing the members that must compose a valid IEP team).

Marshall Joint Sch. Dist. No. 2 v. C.D., 616 F.3d 632, 640-41 (7th Cir. 2010); cf. Marc C. v. North East Independent Sch. Dist., 455 F. Supp. 2d 577, 594 (W.D. Tex. 2006) (school district not required to consent to a homebound placement prescribed by a doctor). The School District did consider the notes from J.P.'s doctors, which included assertions that J.P. required an IEP or Section 504 plan. However, the School District was not legally compelled to assent to these orders from the doctors; instead, the law provides that J.P.'s medical information was to be considered in addition to a variety of factors and relevant considerations. Furthermore, the Parent in this case withheld her consent that would even have allowed school officials to speak with J.P.'s physicians, and thus actually had the effect of limiting some of the medical information that could have been used to assess J.P. In our view, the Parent cannot create barriers to more highly informed decision-making by refusing to provide access to full medical information, and then cite those self-created barriers as grounds to question that educational decision. In short, we do not find that the School District erred by failing to consider J.P.'s medical information.

### B. The District Did Not Violate its Child-Find Obligations

The IDEA requires school districts to identify, locate, and evaluate all children with prospective disabilities who reside within its boundaries. 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 104.32. When a district identifies a student with a

disability who is eligible to receive special education, the district is obligated to provide that student with a free appropriate public education ("FAPE"). 20 U.S. § 1414; 34 C.F.R. § 104.33(a). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." M.R., 680 F.3d at 268-69 (quoting Rowley, 458 U.S. at 188-89). Although a state is not required to maximize the potential of every child who has a disability, "it must supply an education that provides 'significant learning' and 'meaningful benefit' to the child." Id. (quoting D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 556 (3d Cir. 2010)).

School districts are required under the IDEA to identify and evaluate all students who are reasonably suspected of having a disability. P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 738 (3d Cir. 2009) (citation omitted); 20 U.S.C. § 1412(a)(3) (providing that states must "identif[y], locate[], and evaluate[]" all children with disabilities who are in need of special education, and must develop "a practical method . . . to determine which children with disabilities are currently receiving needed special education and related services"). This statutory obligation is what courts refer to as the IDEA's "child find" requirement. M.R., 680 F.3d at 271. Each state must establish procedures to fulfill this statutory requirement, 34 C.F.R.

§ 300.111, and Pennsylvania's procedures are set forth in 22 Pa. Code §§ 14.121 through 14.125.

The Third Circuit has recently explained the obligation in this way:

> Neither the IDEA, its implementing regulations, nor the applicable Pennsylvania regulations establish a deadline by which children who are suspected of having a qualifying disability must be identified and evaluated. Accordingly, we have previously "infer[red] a requirement that this be done within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." In adopting the "reasonable time" standard, we noted the budgetary constraints and staffing pressures facing school officials, and emphasized that we were not establishing any "bright-line rule" as to what constitutes a reasonable time. Rather, we employ a case-by-case approach and assess whether the school district's response was reasonable "in light of the information and resources possessed" by the district at a given point in time.

M.R., 680 F.3d at 271-72 (internal citations omitted).

In this case, the School District was aware that J.P. had suffered two concussions and that his mother had expressed concerns about the effect that they were having upon his education and his behavior. Not long after his first concussion, J.P. received a full medical clearance to return to school and all programs. Additionally, school officials had not identified observable changes in J.P.'s behavior, attendance, or academic performance between his pre-concussion and post-concussion period. The School District received notice that J.P. suffered a second concussion in December 2012, and notification from J.P.'s doctors that he was not to

engage in any school work, which was itself followed by a request from the Parent for the School District to conduct an evaluation. Thereafter, the School District issued the Parent a Permission to Evaluate Form on December 20, 2012, requesting permission to conduct an initial evaluation. The Parent failed to respond to this initial request, and the School District sent a follow-up on January 7, 2013.

As discussed at length above, once the Parent returned the necessary permission form, the School District engaged in a robust and carefully structured evaluation process, culminating in a detailed report outlining its findings and the conclusion that J.P. was not entitled to special education services. Like the Hearing Officer, we conclude that the School District's evaluation and response to the Parent's requests was appropriate and fulfilled its obligations under the law. The Parent has not explained in any persuasive way how the School District violated child-find duties, or how its thorough and comprehensive evaluation of J.P. in early 2013 was legally insufficient.

### C. The District Court Properly Found that J.P. Was Not Eligible for Special Education Services Under the IDEA and Did Not Qualify for a Section 504 Plan

Under the IDEA, a "child with a disability" is eligible for special education and related services. 20 U.S.C. § 1401(3). A child with a disability is defined as a child evaluated in accordance with federal regulations, 34 C.F.R. §§ 300.530-.536, as

having an intellectual disability, a hearing impairment, a speech or language impairment, a visual impairment including blindness, serious emotional disturbance, an orthopedic impairment, autism, traumatic brain injury, or other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who by reason or those one or more disabilities, requires special education and related services. 34 C.F.R. § 300.7. In accordance with the regulations, in order for a child to require specially designed instruction, the child must need adaptation to the content, methodology or delivery of instruction in order to accommodate the unique needs of the child that result from the disability, and to ensure that the child can access the general curriculum in order to meed prevailing educational standards. 34 C.F.R. § 300.39.

The Parent has brought claims in this case under both the IDEA and the Rehabilitation Act, and the standards applicable to these claims overlap in important ways. The IDEA requires states receiving federal funding to provide a FAPE to all disabled children residing within the state. 20 U.S.C. § 1412(a)(1). Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in federally funded programs. 29 U.S.C. § 794(a). The Third Circuit has held that "there are few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition and have noted that the regulations implementing § 504 require that school districts

provide a free appropriate education to each qualified handicapped person in its jurisdiction. Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 253 (3d Cir. 1999) (internal quotation marks omitted), superseded by statute on other grounds as recognized by P.P. v. W. Chester Area Sch. Dist., 585 F.3d 727 (3d Cir. 2009). "[C]ase law makes clear that a party may use the same conduct as a basis for claims under the IDEA and the RA." Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation, 490 F.3d 337, 347 (3d Cir. 2007). "Therefore, when a state fails to provide a disabled child with a free appropriate public education, it violates the IDEA. However, it also violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability." Id. at 350. However, a violation of the IDEA is not a per se violation of the Rehabilitation Act, and the requirements for proving a Section 504 claim must still be proven. Id. at 349-50. In order to prevail on a Section 504 claim, a plaintiff must prove that (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school district receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at the school on the basis of her disability. The plaintiff must also prove that the school district new or should reasonably have been expected to know of her disability. Ridgewood, 172 F.3d at 253.

The regulations instruct that in order to determine a child's disability for an individualized education plan ("IEP"), or for a Section 504 service agreement, the District must complete comprehensive assessments in all areas related to the suspected disability in order to identify all of the child's special education and related service needs. 34 C.F.R. § 300.304(c)(7); see also 22 Pa. Code § 14.153(3). This evaluation must be conducted by qualified individuals and with appropriate assessment tools. 20 U.S.C. § 1414. The regulations provide that the evaluation must be based upon information drawn from a variety of sources, and cannot be based solely on any single measure. 34 C.F.R. §§ 300.304(b)(1)-(3); 34 C.F.R. § 300.306(c)(1).

In this case, the Hearing Officer concluded that J.P. was not eligible for special education services pursuant to the IDEA. In the second due process decision, the Hearing Officer highlighted the fact that the School District undertook a detailed assessments of J.P. following his concussions, and following the Parent's requests. The record supports the District's argument that its assessments of J.P. were appropriately conducted, and were focused on examining whether J.P. had a disability that required that he receive special services. As the District makes clear in its brief, and as reflected in the administrative record and the Hearing Officer's decision, J.P.'s

concussions did not adversely affect his academic performance, or compel a finding that he needed special education and related services.

Indeed, although the Parent criticizes the Hearing Officer's conclusions, she does not and cannot reasonably assert that the Hearing Officer failed to explain or justify the reasons why he found her to be less credible and persuasive than the School District's witnesses, since he expressly noted that he found her testimony to have "serious inconsistencies." (HOD2, p. 30.) In this regard, the Hearing Officer pointed out that the Parent overstated J.P.'s injuries, as well as their effect on his academic performance, and that she testified about J.P.'s medical circumstances in a manner inconsistent with the stipulations that the parties agreed upon.

The Hearing Officer thus adequately explained the reasons why he gave less credence to the Parent's testimony offered in J.P.'s favor, and we find that the Hearing Officer's explanation comports with the evidence that was before him and should not be disturbed. This is particularly true where the Hearing Officer "has heard live testimony and determined that one witness is more credible than another witness," as in such cases "[the hearing officer's] determination is due special weight." D.S., 602 F.3d at 564.

**D. The Hearing Officer Correctly Found that J.P. is Not Entitled to Compensatory Education**

The Parent also claims that the School District should be required to pay for compensatory education hours. Because we have found that the District did not deny J.P. FAPE and did not otherwise qualify under the IDEA or Section 504, we disagree.

It is well settled that compensatory education is an equitable remedy that is available only after a parent has proven that a child has been denied FAPE or the benefits of school. M.C. on Behalf of J.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 397 (3d Cir. 1996). Thus, "[a] disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education." Lauren W. ex rel. Jean W. v. DeFlamminis, 480 F.3d 259, 272 (3d Cir. 2007). In this case, because we have found that the District did not deny J.P. FAPE or the benefits of school, we necessarily also find that he is not entitled to compensatory education.[2]

---

[2] The plaintiff suggests that because J.P. was referred to the Brain STEPS program, he should automatically qualify for an IEP or a service agreement, but she provides no legal support for this assertion because there is none. Furthermore, as the School District persuasively explains, the Brain STEPS program is intended to assist students with head injuries return to school, and is quite distinct from an IEP or service agreement.

**E.     The District Did Not Discriminate Against J.P. Under Section 504
of the Rehabilitation Act**

The Parent has also claimed that the District discriminated against J.P. in

violation of Section 504 of the Rehabilitation Act.  We find that the District did not

discriminate against J.P. with respect to his claimed disability, and the Plaintiff has

failed to adduce evidence to show intentional discrimination on the basis of disability.

In a Section 504 claim of disability discrimination in the educational context,

a plaintiff must show that:

> (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified"
> to participate in school activities; (3) the school or the board of
> education receives federal financial assistance; and (4) he was excluded
> from participation in, denied the benefits of, or subject to discrimination
> at, the school.  W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995) (quoting
> Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1380
> (3d Cir. 1991)).   In addition, the plaintiff must demonstrate that
> defendants know or should be reasonably expected to know of his
> disability.  But a plaintiff need not prove that defendants' discrimination
> was intentional.  We have held that there are few differences, if any,
> between IDEA's affirmative duty and § 504's negative prohibition and
> have noted that the regulations implementing § 504 require that school
> districts "provide a free appropriate education to each qualified
> handicapped person in [its] jurisdiction."

Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 253 (3d Cir. 1999)

(citations omitted).  We find that the Plaintiff has failed to satisfy this burden in this

case, since we have found that the actions of the District were not discriminatory or

otherwise improper.  To the contrary, we find that the record amply demonstrates that

the District properly, timely, and fairly evaluated J.P., considered a variety of factors in its assessment of Parent's claims on her son's behalf, and reasonably concluded that J.P. did not require special education services. The Hearing Officer reasonably and correctly found that J.P. was not eligible under Section 504, and, therefore, that the discrimination prohibitions under the Act do not apply. (HOD2, p. 32.) Nevertheless, the Hearing Office also properly found that even if J.P. was eligible, there was no evidence to show that the School District discriminated against him.

The Hearing Officer's decision upholding the District's conclusions was fully supported and clearly discussed in a comprehensive decision. The Plaintiff's discrimination claim fails for lack of proof, and her disagreement with the results of the administrative process in this case is insufficient to support a Section 504 discrimination claim.[3]

---

[3] The Parent raised two other issues with the Hearing Officer that are not mentioned anywhere in the complaint in this case. In the first instance, the Parent sought to have the School District assign J.P. a mentor to help him complete his senior project. The School District has explained that it does not typically assign mentors to any of its students. (Doc. 39, p. 42.) In the second instance, the Parent had sought to amend J.P.'s disciplinary record at the administrative hearing with the Hearing Officer. Neither of these claims have been brought to this Court as part of this consolidated appeal, and the Parent has not provided any argument or record evidence in support of these claims. Accordingly, these claims, belatedly brought before the Hearing Officer in any event, are not before the Court in this case.

## VI.  RECOMMENDATION

For all of the foregoing reasons, it is respectfully recommended that the District's motion for judgment on the administrative record (Doc. 38.) should be GRANTED, and the Plaintiff's cross motion (Doc. 40.) should be DENIED.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 16th day of September 2015.

***S/Martin C. Carlson***
Martin C. Carlson
United States Magistrate Judge
